**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| EDWINA L. PRUITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-01048 |
| | ) | Chief Judge Crenshaw |
| CHSPSC, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Pending before the Court in this employment discrimination case brought by Edwina L. Pruitt is a fully briefed Motion for Summary Judgment filed by CHSPSC, LLC. (Doc. No. 23).[1] For the reasons that follow, the Motion will be granted in part and denied in part.

### I.  Factual Background

The parties have filed 133 paragraphs of supposedly undisputed facts, only a small percentage of which is necessary to place Pruitt's claims and the parties' arguments in context. Construed in Pruitt's favor those facts are as follows:

CHSPSC, LLC provides legal, human resources, consulting, information technology, and other professional services to contracted healthcare facilities around the country.  CHSPSC employees are housed in corporate offices in Franklin, Tennessee.

Pruitt, an African American woman, was hired into a temporary position at CHSPSC in November 2011. In January 2012, she became as an administrative assistant to Mike O'Shea, a Caucasian male, who was the Chief Technology Officer ("CTO").  On March 12, 2012, Pruitt

---

[1] Also pending are CHSPSC's Motion to File Excess Pages (Doc. No. 24) and Pruitt's Motion for Extension of Time to File Response (Doc. No. 28).  Both Motions are unopposed and will be granted.

became O'Shea's permanent administrative assistant with an annual salary of $42,000, and worked out of the CHSPSC facility at Cool Springs Common. Pruitt liked working for O'Shea, who admittedly treated her well. Pruitt never received any form of discipline while working for O'Shea.

On June 10, 2013, CHSPSC hired Manish Shah, a male of Indian descent, as its Deputy Chief Information Officer ("DCIO"). Initially, Shah and Pruitt spoke by phone, and those interactions were pleasant. That allegedly changed, however, when Shah met Pruitt in person in April or May 2014. Pruitt described their meeting and Shah's reaction, as follows:

> When he came into the building, he had a meeting with Michael [O'Shea]. When I walked up to my desk, I said, "May I help you?" And he said he was looking for Edwina. I said, "Well, that would be me." And he just kind of stopped in his tracks and he kind of looked at me, and it was just this expression, and he said, "You're not exactly what I expected." And I said, "Well, what did you expect?" And he never responded. He turned around and walked away.

(Doc. No. 23-1, Pruitt Dep. at 72-73). Pruitt believes Shah's comment about not being "what I expected' was racially biased and derogatory, and resulted from Shah being "shocked" to learn that Pruitt is black. (Id. at 74). Thereafter, according to Pruitt, the interaction between the two was very different: Shah's tone of voice on the phone changed, he became very short, pointed, direct, and almost stern with Pruitt. Further, when they would see each other at work (CHSPSC claims this was rare, Pruitt asserts it happened 3 to 4 time as week), Shah refused to speak with Pruitt, even after she greeted him.

At some point before O'Shea left CHSPSC on December 14, 2014, Pruitt complained about Shah's comment and reaction to Leanne Reeves, who at that time was CHSPSC's Senior Director of Human Resources. Reeves had not previously received a complaint about Shah, nor has anyone else complained since Pruitt.

Reeves knew that Pruitt was upset, but did not interpret her complaint to be about race

2

discrimination or harassment. Nevertheless, she spoke to Shah who stated that he was sorry to hear that Pruitt took offense, that was not his intent, and he was just making an observation. Reeves then reported the conversation to Pruitt. Shah did not personally apologize to Pruitt, however.

On November 20, 2014, while Pruitt was on Family Medical Leave for knee replacement surgery, Sibyl White, a Caucasian female and Shah's senior administrative assistant, sent an e-mail to Reeves and two other human resources representatives on Shah's behalf. Knowing that O'Shea had indicated an intent to resign, the email inquired as to whether Pruitt could work as an administrative assistant to Kirk Swilley, a Caucasian and Senior Director of the Information Systems ("IS") Department, because that was the only administrative assistant position available. In a follow-up email the next day, White wrote:

> We heard from Edwina Pruitt today, and she'll be back Tuesday. We have the only AA opening and have someone identified (external) candidate that the director wants to hire, but can we keep this open for Edwina? Please let Manish [Shah] know as soon as you can so we'll know how to move forward.

(Doc. No. 23-2 at 56, CHSPSC Rule 30(b)(6) Depo. Ex. 8).

By the time O'Shea voluntarily resigned in December 2014, Pruitt had returned from Family Medical Leave. His position was not immediately filled, however. In O'Shea's absence, according to CHSPSC, Reeves received information from other administrative assistants that Pruitt was visiting other employees a lot, and was frequently in and out of the office, which raised concerns about Pruitt's productivity. (Id. at 45-46).

In late December 2014 or early January 2015, Pruitt was reassigned as an administrative assistant to Swilley. CHSPSC claims this was because O'Shea's position as CTO was vacant, CHSPSC did not know how long it was going to take to find another CTO, Pruitt had no one to support as an administrative assistant, and Swilley did not have an administrative assistant. Pruitt,

on the other hand, claims the reassignment was in retaliation for having complained about Shah. On this point, she notes that when Chief Information Officer Eric Harrison resigned, White was allowed to remain in her position as an administrative assistant, even though Shah was not hired until months later.

As the administrative assistant to Swilley, Pruitt remained in the IS department, but was moved from technology to the physicians practice service in the Carothers building where Swilley worked. The move did not reduce Pruitt's compensation or benefits. Nevertheless, Pruitt viewed this as a demotion because she went from supporting a C-level position (CTO) to supporting a senior director and the move "greatly diminished" her job duties. The level of her work also dropped off because Swilley was "very self-sufficient." (Pruitt Depo. at 83, 89-90)

Administrative assistants at CHSPSC are classified as either an administrative assistant, senior administrative assistant, or executive administrative assistant. Pruitt was an administrative assistant when working for O'Shea, and she remained an administrative assistant when supporting Swilley.

In early 2015, Pruitt began receiving a number of what she considered "nitpicky" emails from White regarding work related issues. Although White had no direct supervisory authority over Pruitt, she was a senior administrative assistant and responsible for scheduling, monitoring time and attendance, and collecting payroll exception reports from other administrative assistants. The "nitpicky" emails included Pruitt being instructed by White that she could only take two instead of three computer monitors when she went to work for Swilley, and being informed that she was sending too many e-mails letting the other administrative assistants know she was leaving early for physical therapy appointments. Other "nitpicky" behavior included a new human resources

4

coordinator asking Pruitt about a missing exception report.

On February 4, 2015, Pruitt e-mailed Reeves requesting a meeting. Pruitt wrote:

> Is it possible to meet with you sometime this week? For the past month or so, I have felt as if something were amiss, today I get a call concerning my presence here in the office. I understand that IS has its own unique vibe, but there is no reason for some of the behaviors that continue in this department. I just need to speak with you."

(Pruitt Depo., Ex. 34). Two days later Pruitt and Reeves met, with Pruitt claiming that they discussed a number of Pruitt's concerns, including White's "nitpicky" and harassing behavior, the reassignment to Swilley, and Pruitt being told by White and Shah that she was not going to keep her job under any circumstances. Pruitt also claims to have told Reeves about Scott Breece, the Vice President of Security, allegedly striking the names of African Americans from an applicant pool. According to Pruitt, Breece struck applicants with names like "D'Angelo," "Andre" and "Mohammed," while applicants named "Peter, " "Joseph" and "Robert" were not stricken from the candidate pool.

On February 13, 2015, Pruitt e-mailed Reeves and stated, in pertinent part, that "things are getting really upsetting and confusing for me, and basically, I just need to know if I need to start looking for another job." (Id., Ex. 27.). Pruitt claims that in addition to the items she had previously discussed with Reeves, she was concerned about White watching her "every move," and the daily communication she was receiving about her upcoming move from the Springs Commons location to the Carothers building. (Id. at 151-153).

After a new CTO was named, Pruitt applied to be his administrative assistant. She updated her resume and filed her application on March 2, 2015. On March 18, 2015, Pruitt e-mailed Andrew Bellm, CHSPSC's Human Resources Coordinator, and asked him whether she should assume that the IS Department was looking to go in a different direction since CHSPSC was still requesting

applicants. Bellm responded by stating that he "would not make that assumption at this point. We are simply getting a robust candidate pool." (Id. Ex. 22). The next day, March 19, 2015, Pruitt withdrew her application.

Even though no one told Pruitt to withdraw her application, she claims she did so because Reeves had told her that CHSPSC was going in a different direction, and both Shah and White had made clear to her that she would not become an administrative assistant to the new CTO.

Nicola Booker, a white female external candidate was hired on July 1, 2015 as the administrative assistant for the new CTO, Chris Lewis, a Caucasian, who was also an external candidate. Booker had worked for more seven years at St. Francis Hospital, serving as the Continuing Medical Education Coordinator organizing and overseeing all continuing medical education activities at the hospital, and worked with the Executive Vice-President, Chief Accounting Officer, and the Medical Director. When hired by CHSPSC, Booker was paid an annual salary of $44,000. At that time, Pruitt's annual salary was $45,030.61.

After withdrawing her application, Pruitt received the same salary and benefits as before. She continued to work for Swilley, and was given additional duties by Swilley to match her skill set.

On May 18, 2015, Pruitt applied for the position of associate application systems analyst. CHSPSC claims this was the result of Swilley encouraging Pruitt to apply because it would be better for her career and advance her knowledge, while Pruitt claims Swilley recommended that she apply to get away from White. Regardless, Pruitt received the promotion, along with a 4% raise (and full benefits), even though she had no prior experience in the field. She remains in that position today.

Since becoming an assistant systems analyst, Pruitt has had no interaction with White. She admits that White never made any derogatory or racist comments towards her, and that White and

6

Shah are the only members of CHSPSC's IS department that allegedly acted in a racist or biased manner towards her. Further, Pruitt concedes she liked working for all of her supervisors, including O'Shea, Swilley, and Jennifer Demaraski, a white female who is her current supervisor.

After Pruitt was promoted to the associate application systems analyst position she applied for other positions because she did not like the travel that came with being on the "deployment team" to which she was assigned. On four occasions, she applied for a promotion to become an application systems analysis. Three of those positions ended up not being filed. For the fourth, CHSPSC hired Shellie VanEtten, a Caucasian female, who, at the time of hiring on April 4, 2016, had been with CHSPSC since October 2012, having held numerous positions including being an HMS/Medhost Deployment Analyst, Project Manager for computerized physician order entry issues, and a Training Deployment Analyst. In Reeves' opinion, Pruitt was not qualified because she had very little IS experience, and the application systems analyst position required revenue cycle application experience, project management, systems analysis, design testing, and a number of skill sets that could not have been mastered in less than a year in her associate application systems analyst position.

On April 22, 2016, Pruitt applied for a project contract coordinator position. This position required a bachelor's degree, which Pruitt had yet to obtain. Pruitt applied for numerous other positions as well, but those were either lateral or lower-level positions.

At the time Pruitt was appointed as an associate application systems analyst, the position had a minimum salary of $43,132, a midpoint of $53,915, and a maximum salary of $64,698. Pruitt was paid $46,830. Since then, her salary increased by two percent (2%) to $47,768.83 on January 1, 2016, by three percent (3%) to $49,203.88 on January 1, 2017, and then to $49,696.00 on January

7

1, 2018.  Nevertheless, Pruitt claims that she was paid less that five other associate applications systems analysts, all of whom were paid a salary of $50,000 per year and are Caucasian: Madison Gray, Winter Davis, Nick Davidson, Zach Burgess, and Katie Cawley. However, each of those employees was hired directly into the position from outside, while Pruitt, who had no IS experience at the time, was promoted from within.  CHSPSC claims that because of the job market, it pays external candidates more to lure them into working for CHSPSC.  Regardless, during this same time frame, three of the five IS associate application systems analysts who were internally promoted and are Caucasian received a lesser salary than Pruitt.  Also during this same period, seven African-American, two Asian-American, one Hispanic American, and one mixed-race American associate application systems analysts were each paid higher salaries than the newly-hired external candidates.

Based upon the foregoing, Pruitt filed suit in this Court on July 11, 2017, alleging discrimination, retaliation, failure to promote, harassment, and unequal pay.  Those claims are brought under Title VII, 42 U.S.C. § 2000e *et seq.*, and Section 1981, 42 U.S.C. § 1981.  CHSPSC seek summary judgment on all of Pruitt's claims.

## II.  Standard of Review

As this Court has observed in the past, [t]he standards governing summary judgment have been restated on countless occasions and are well known."  Kryder v. Estate of Rogers, 296 F. Supp. 3d 892, 900 (M.D. Tenn. 2017); McGlone v. Metro. Gov't of Nashville, 272 F. Supp. 3d 1030, 1036 (M.D. Tenn. 2017)  Put simply: (1) summary judgment is only appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a); (2) the facts and inferences must be construed in favor of the nonmoving party,  Van Gorder

8

v. Grand Trunk W. R.R., Inc., 509 F.3d 265, 268 (6th Cir. 2007); (3) the Court does not weigh the evidence, or judge the credibility of witnesses when ruling on the motion, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); and (4) the mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment, Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003).

### III.  Legal Discussion

The analytical framework for deciding employment discrimination claims is also well known.  However, prior to setting forth that framework, a preliminary matter must be addressed.

**A.  Statutes of Limitations**

CHSPSC argues that Pruitt's Title VII clams for discrimination, retaliation, and harassment are untimely.  Pruitt does not address this argument, even though it was raised in CHSPSC's opening brief.

"Plaintiffs must typically file a timely discrimination charge with the EEOC in order to bring a Title VII lawsuit."  Amini v. Oberlin Coll., 259 F.3d 493, 498 (6th Cir. 2001) (citing Alexander v. Local 496, Laborers' Int'l Union of N. Am., 177 F.3d 394, 407 (6th Cir.1999). "Pursuant to the statutory language of Title VII, the applicable statute of limitations begins to run from the date of 'the alleged unlawful employment practice [.]'" Id. (quoting 42 U.S.C. § 2000e–5(e)(1)).  Because Tennessee is a deferral state, "[a] Title VII plaintiff must file a charge with the EEOC within 180 days after the occurrence of the alleged discriminatory employment practice or within 300 days, if the claimant has 'initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice.' 42 U.S.C. § 2000e-5(e)(1)." Granderson v. Univ. of Michigan, 211 F. App'x 398, 401 (6th Cir. 2006); accord Jones v. City of Franklin, 309 F. App'x 938, 945 (6th

9

Cir. 2009); Tartt v. City of Clarksville, 149 F. App'x 456, 460 (6th Cir. 2005).

Pruitt filed an EEOC charge on October 13, 2016, alleging race discrimination and retaliation because she was reassigned to work for Swilley and she had to reapply to become an administrative assistant to Lewis. Pruitt fully transitioned into being Swilley's administrative assistant by January 2015,[2] and Booker was hired as Lewis's administrative assistant on July 1, 2015. Both of these events occurred long before December 18, 2015, which would have been the start date for a claim filed 300 days before October 13, 2016. Further, Pruitt points to no harassing behavior that occurred after December 18, 2015. As such, her Title VII claims for discrimination, retaliation, and harassment are untimely.

This does end the matter even as to those specific claims, however, because they are also brought under Section 1981. As CHSPSC acknowledges, there is a four year statute of limitation in Tennessee for claims under that statute. Anthony v. BTR Auto. Sealing Sys., Inc., 339 F.3d 506, 514 (6th Cir. 2003); Mayers v. Campbell, 87 F. App'x 467, 471 (6th Cir. 2003).

## B. Discrimination and Retaliation Claims

Section 1981 provides that "[a]ll persons . . . shall have the same right in every State and Territory to make and enforce contracts, . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981. Although this language differs markedly from the language of Title VII, discrimination and retaliation claims under both statutes are analyzed under the same standards. Rogers v. Henry Ford

---

[2] In its brief, CHSPSC asserts that the transfer "occurred in either December 2014 or January 2015 when Pruitt says she was removed from her exiting position to Swilley's administrative assistant." ((Doc. No, 25 at 9). These different dates come from Pruitt's deposition testimony, and her updated resume when she applied to become Lewis' administrative assistant. Given the size of CHSPSC, one would think that the exact date of the transfer would be well-documented. Regardless, Pruitt does not dispute that she went to work for Swilley at some point during this time frame.

10

Health Sys., 897 F.3d 763, 771 (6th Cir. 2018); Tennial v. United Parcel Serv. Inc., 840 F.3d 292, 303 (6th Cir. 2016); Johnson v. Univ. of Cincinnati, 215 F.3d 561, 573 n.5 (6th Cir. 2000). "Under this framework, a plaintiff can prove racial discrimination by proffering either direct evidence or circumstantial evidence." Tennial, 840 F.3d at 303. Pruitt claims to have both.

Direct evidence is evidence which, if believed, requires the conclusion that unlawful discrimination or retaliation was at least a motivating factor in the challenged employment decision. Young v. UPS, 135 S.Ct. 1338, 1345 (2015); Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003). If the plaintiff presents credible direct evidence of discrimination or retaliation, then the defendant's burden is a burden of proof – not merely production – to show that the defendant would have made the same decision even if not motivated by discrimination. Johnson v. Univ. of Cincinnati, 215 F.3d 561, 572-73 (6th Cir. 2000); Jacklyn v. Shering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999).

In support of her direct evidence case, Pruitt writes:

> In this case, Plaintiff's supervisor, Mr. Shah through his Administrative Assistant Sibyl White (also with supervisory authority over Plaintiff) noted in an email conversation that Plaintiff was setting up a discrimination claim and that if Defendant would remove Plaintiff from her job position and require her to change work locations, she likely would quit "because it's a demotion and not enough control."

(Doc. No. 30 at 9). Even leaving aside that the emails were written after Pruitt had already begun working for Swilley, this does not establish direct evidence of either discrimination or retaliation.

As an initial matter, the "email conversation" Pruitt cites is actually two separate emails discussing separate topics. In the first, dated February 11, 2015, White wrote Reeves that she was going to send Reeves additional information about what Pruitt allegedly said to her co-workers, with White expressing the opinion that she "believed [Pruitt] is setting it up for discrimination." (Reeves

11

Depo. Ex. 12). According to Reeves, this email was in reference to Pruitt complaining that the "white girls" did not invite her to lunch, when in fact they had. (Id. at 96). The second dated four days earlier was from White to Reeves in which White asked whether Pruitt "could move over here," and expressed the "opinion" that Pruitt would "leave because it's a demotion and not enough control." (Id. Ex. 11). Exactly what position "over here" meant, and whether that position was the one considered to be a demotion is unclear.

Further, cobbling together two different emails that can be interpreted to relate to any of a number of things is not, as a matter of law, direct evidence. "Direct evidence proves the existence of discrimination 'without requiring any inferences.'" Golden v. Mirabile Inv. Corp., 724 F. App'x 441, 446 (6th Cir. Mar. 6, 2018) (citing Rowan v. Lockheed Martin Energy Sys., Inc., 360 F.3d 544, 548 (6th Cir. 2004). In other words, "'when direct evidence is provided, no inferences are needed in order to conclude that . . . discrimination is afoot." Bradley v. Rhema-Nw. Operating LLC, No. 16-2493, 2017 WL 4804419, at *2 (6th Cir. Oct. 3, 2017) (quoting Tennial, 840 F.3d at 302). Thus, for example, a university president's alleged statement that "[w]e already have two black vice presidents. I can't bring in a black provost," Johnson, 251 F.3d at 577, was direct evidence of race discrimination, while a manager expressing "concern about the potentially detrimental effect on business of having an African-American co-manager," Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003), was not.

No matter how it is viewed, an employee's opinion that another employee was trying to set the company up for a discrimination claim because that employee viewed a position as a demotion is not direct evidence of discrimination. It expresses nothing about what the employer did or did not do, or the reasons for the action or inaction that was supposedly adverse.

12

In the absence of direct evidence, Pruitt is left with establishing her discrimination and retaliation claims through indirect of circumstantial evidence under the burden shifting paradigm set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), as refined by Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981). This begins with the requirement that Pruitt establish a *prima facie* case of discrimination or retaliation. If she establishes a *prima facie* case, the burden of production shifts to [CHSPSC] to articulate a legitimate nondiscriminatory reason for the adverse employment action." Schoonmaker v. Spartan Graphics Leasing, LLC, 595 F.3d 261, 264 (6th Cir. 2010) ; Allen v. Highlands Hosp. Corp., 545 F.3d 387, 394 (6th Cir.2008). If CHSPSC does so, the "the burden of production shifts back to [Pruitt] to show that the employer's explanation was a mere pretext for intentional [race] discrimination." Id.

"To establish a *prima facie* case of discrimination under Title VII [or Section 1981], [Pruitt] must show that 1) she is a member of a protected class; 2) she was qualified for the job and performed it satisfactorily; 3) despite her qualifications and performance, she suffered an adverse employment action; and 4) she was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside her protected class." Logan v. Denny's, Inc., 259 F.3d 558, 567 (6th Cir. 2001) (citing Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir.1992)). "To establish a prima facie case of retaliation under Title VII [or Section 1981], [Pruitt] must demonstrate that: '(1) [s]he engaged in activity protected by Title VII [or Section 1981]; (2) h[er] exercise of such protected activity was known by [CHSPSC] ; (3) thereafter, [CHSPSC] took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.'" Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014) (quoting Jones v. Johanns, 264 F. App'x 463, 466 (6th Cir. 2007)).

13

CHSPSC argues that Pruitt's prima facie case of discrimination and retaliation fail because she cannot show an adverse employment action.  It writes:

> "Ordinarily, reassignments without salary or work hour changes do not constitute adverse employment actions in employment discrimination claims."  Russell v. Drabik, 24 F. App'x 408, 413 (6th Cir. 2001) (citing Yates v. Avco Corp., 819 F.2d 630, 638 (6th Cir. 1987)).  To be an adverse action, the reassignment must cause a materially adverse change in the terms of the employee's employment, such as a decrease in wage or salary, less distinguished job title, material loss of benefits, or significantly different responsibilities.  See Kocsis v. Multi-Care Mgmt., 97 F.3d 876, 885-86 (6th Cir. 1996); Freeman v. Potter, 200 F. App'x 439, 442 (6th Cir. 2006) ("[An adverse employment] action usually 'inflicts direct economic harm.'").  As Pruitt admits, her reassignment did not reduce her compensation, benefits, or change her department. . . . She also remained in the same job classification – administrative assistant.

(Doc. No. 25 at 11).

This argument is correct insofar as it relates to most discrimination claims.  However, after the Supreme Court's decision in Burlington Northern and Santa Fe Railway Co. v. White, 548 U.S. 53 (2006), "plaintiff's burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context." Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595–96 (6th Cir. 2007).  "A materially adverse employment action in the retaliation context consists of any action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' . . . This more liberal definition permits actions not materially adverse for purposes of an anti-discrimination claim to qualify as such in the retaliation context." Id. (citations omitted).  Indeed in Burlington Northern, the Supreme Court recognized that actions typically construed as nonmaterial could rise to the level of an adverse employment action for purposes of a retaliation claim when considered in context, such as a change in the work schedule of a young mother with children in school, or the failure to invite an employee to lunch when the lunch includes a training session important to the employee's career. 548 U.S. at

14

69; see also Laster, 746 F.3d at 732 (stating that denying an employee training opportunities and privileges, singling him out for violating policies, and disciplining him more harshly could be an adverse action for purposes of a retaliation claim); Michael, 496 F.3d at 596 (holding that placing employee on brief paid administrative leave and 90–day performance plan meet "relatively low bar" of materially adverse action for purpose of retaliation claim); Halfacre v. Home Depot, U.S.A., Inc., 221 Fed. App'x. 424, 432 (6th Cir. 2007) (remanding for reconsideration, in light of Burlington Northern, whether assigning the plaintiff a poor performance-evaluation score constituted an adverse employment action for the purpose of setting forth a retaliation claim).

Notwithstanding that Pruitt retained her title, pay, and benefits, when the facts are construed in her favor she arguably has forwarded sufficient evidence to suggest that a reasonable co-worker could be dissuaded from filing a complaint as a result of what happened to her. She became an administrative assistant to a Senior Director, instead of a Chief, and with it lost whatever prestige her former position may have had. True, "'[p]restige,' much like beauty, is in the eye of the beholder," Freeman v. Potter, 200 F. App'x 439, 444 (6th Cir. 2006), but "loss of prestige, either within an organization or with regard to the general public, is an objective factor that a court should consider as part of the reasonable person test," Doe v. Dekalb County Sch. Dist., 145 F.3d 1441, 1452 n.19 (11th Cir. 1998). See also Holland v. Gee, 677 F.3d 1047, 1057 (11th Cir. 2012) (emphasis in original) (holding that a transfer can be adverse "if it involves a reduction in pay, *prestige or responsibility*"); Beyer v. Cty. of Nassau, 524 F.3d 160, 165 (2d Cir. 2008)(stating that "an adverse employment action can exist when an employee's new assignment is 'materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement'"); Williams v. All. Nat. Inc., 24 F. App'x 50, 53 (2d Cir. 2001) ("A plaintiff can show

15

an adverse employment action where, even though she was transferred to a job with the same rank and pay, the new position was arguably less prestigious or entailed diminished responsibilities"). This is so even "though a plaintiff's subjective impression concerning the desirability of one position over another generally does not control with respect to the existence of an adverse employment action," Mitchell v. Vanderbilt Univ., 389 F.3d 177, 183 (6th Cir. 2004), because White, who worked for Shah and at least had some control over Pruitt, arguably expressed the "opinion" that the position Pruitt held as Swilley's administrative assistant was "a demotion."[3] Regardless, when Pruitt was reassigned to work for Swilley, she was removed from her prior role as the administrative assistant to the CTO, and with that removal she lost whatever inroad she may have had to perhaps being considered a presumptive heir to the same position when the new CTO came on board, much like White retained her position when Shah was hired.

From the foregoing it should be clear that Pruitt's *prima face* case is exceedingly thin with respect to the adverse employment action element, even as to her retaliation claim. Her evidence is also thin as to whether the proffered reason for the transfer to Swilley was a pretext for retaliation.

CHSPSC argues that Pruitt was transferred for the simple reason that Swilley needed an administrative assistant, and Pruitt was available. It also asserts that concerns had been raised about Pruitt's productivity because she had a tendency to wander when left unsupervised. Both are legitimate, non-discriminatory reasons for a transfer. See Shulman v. Amazon.com.kydc, Inc., No. 15-6211, 2017 WL 5135522, at *2 (6th Cir. Jan. 11, 2017) (finding failure to meet productivity expectations to be a legitimate, non-discriminatory reason); Stockman v. Oakcrest Dental Ctr.,

---

[3] The Court says "arguably" because, as noted previously, from the context of the email it is unclear exactly what White was referencing. Query whether the term "demotion" relates to moving "over here," or the belief that Pruitt would leave because she viewed her present position as Swilley's assistant as a demotion.

16

P.C., 480 F.3d 791, 802 (6th Cir. 2007) (holding that productivity issues and poor performance are legitimate non-discriminatory reasons for an adverse employment action); Williams, 24 F. App'x at 53 (observing that unsatisfactory job performance and need for someone to assume duties of a vacant position were legitimate, nondiscriminatory reasons for transferring an African-American employee); Smalls v. Allstate Ins. Co., 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) (holding that transferring employee to another location to fill a vacancy was a legitimate, non-discriminatory reason).

This leaves the issue of whether CHSPSC's stated reasons are really a pretext for transferring Pruitt in retaliation for having complained about Shah and his underling White. Pretext requires a showing that "(1) the employer's stated reason for [the adverse employment action] has no basis in fact, (2) the reason offered for [the adverse employment action] was not the actual reason . . . , or (3) the reason offered was insufficient to explain the employer's action." Imwalle v. Reliance Med. Prod., Inc., 515 F.3d 531, 545 (6th Cir. 2008) (citing Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir.1994)). "Regardless of which rebuttal method is employed, the plaintiff retains the ultimate burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated [or retaliated] against h[er].'" Id. (quoting Johnson, 319 F.3d at 866). Though a very close call, the Court finds that Pruitt has met that burden with respect to her Section 1981 retaliation claim.

CHSPSC cites Reeves's Rule 30(b)(6) deposition testimony for the proposition that she had received reports that Pruitt roamed when left untethered to a boss. However, the cited portions of that deposition testimony show that this was anecdotal evidence at best. Reeves testified that she thought some of the administrative assistants were "getting frustrated" with Pruitt, and that the

17

complaints about Pruitt being away from her desk were "not factual information that I can say . . . for sure." (Doc. No. 23-2, Rule 30(b)(6) Depo. at 45). Apart from some emails from White, Reeves had no emails or other writings confirming these assertions. Without any substantive evidence, the Court cannot determine whether the proffered reason (decreased productivity) was true. Although logic dictates that if Reeves did not have a boss, her productivity would be low, not due to her but due to CHSPSC. While this Court has no reason to doubt Reeves, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" Nelson v. City of Madison Heights, 845 F.3d 695, 702–03 (6th Cir. 2017) (citing Liberty Lobby, 477 U.S. at 255 (1986)).

CHSPSC's explanation that Pruitt was transferred because there was an opening for an administrative assistant is true in the sense that Swilley needed an assistant and Pruitt became available upon O'Shea's departure. However, it is not altogether clear that this was the actual reason for the transfer, at least when the facts presented are construed in Pruitt's favor. Even before O'Shea left, White jockeyed to have Pruitt moved to the position of Administrative Assistant to Swilley. This was done at Shah's request and White had at least some supervisory authority over Pruitt, this request may have been entirely appropriate. It may have even been an attempt to insure that Pruitt retained a job when she returned from knee replacement surgery and O'Shea left. This magnanimous scenario, however, only works if the Court ignores that Pruitt had complained in the not too distant past about what she believed to be racially-motivated actions and comments by Shah and the apparent friction between Pruitt and White. Further, White was treated differently than Pruitt when her then-Chief left – she was allowed to stay in her position of administrative assistant until Shah arrived. Of course, this may have occurred under different circumstances, *i.e..*, there was

18

no vacancy or another executive in need of an assistant. As it stands, however, CHSPSC's only response (apart from arguing that Swilley needed an assistant) is that "White is not a proper comparator to Pruitt because, *unlike White*, Reeves had received multiple reports from other assistants that after O'Shea left," Pruitt had a tendency to socialize. (Doc. No. 32 at 3). As already noted, however, this lacks any real evidentiary support in the record now before the Court.

Without intending to belabor the point, Pruitt's retaliation claim survives on the thinnest of reeds. Nevertheless, the evidence she has mustered and the inferences to be drawn therefrom are enough to get this claim to trial.[4] A jury, unconstrained by the strictures of Rule 56(c), will have to determine whether CHSPSC acted for legitimate reasons or engaged in retaliation when it moved Pruitt into the position of administrative assistant to Swilley.

**C. Hostile Work Environment**

Pruitt's hostile work environment claim requires significantly less discussion because she does not come close to establishing a *prima facie* case. Pruitt must demonstrate the following to survive summary judgment:

> (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

Williams v. CSX Transp. Co., 643 F.3d 502, 511 (6th Cir. 2011).

---

[4] At trial, there may be an additional hurdle for Pruitt. In Univ. of Tex. Southwestern Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2533 (2013), the Supreme Court held that a Title VII retaliation claim must ultimately be "proved according to traditional principles of but-for causation," meaning "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Whether this causation standard also applies at trial to Section 1981 retaliation claims is an open question in the Sixth Circuit. See Nicholson v. City of Clarksville, 530 F. App'x 434, 447 (6th Cir. 2013) (declining to address whether Nassar's "but for" requirement applies to Section 1981 claims).

After setting forth the law surrounding hostile work environment claims, Pruitt writes:

> In this case, Plaintiff was subjected to a workplace that involved her supervisor's comments and actions after realizing she was African-American, her removal from a job she successfully had performed for three years and reassignment to a new work location in the hope that she would quit her job, nitpicking and micromanaging. The conduct about which Plaintiff testified was not just severe or pervasive, it was severe and pervasive, and it was objectively and subjectively offensive. . . . Defendants' discriminatory conduct altered the conditions of Plaintiff's employment as it culminated in her removal from her job. Hence, as Plaintiff suffered a tangible adverse employment action because of Mr. Shah's and Ms. White's racist conduct and Defendant's failure to failure and refusal to do anything about it, Defendant is foreclosed from availing itself of any affirmative defense. Defendant is strictly liable for its manager's discriminatory conduct.

(Doc. No. 30 at 16). That is the entirety of Pruitt substantive argument, but it is not nearly enough to present a jury question on whether she was subjected to a hostile work environment.

Almost the entirety of Pruitt's argument is conclusory and, for that reason alone, it is insufficient to create a material issue of fact. Alexander v. CareSource, 576 F.3d 551, 560 (6th Cir. 2009); Wright v. Murray Guard, Inc., 455 F.3d 702, 713 (6th Cir. 2006). All the record shows is that Shah allegedly expressed shock upon learning that Pruitt was black and thereafter treated her differently. Beyond that, Pruitt concedes that White never made any derogatory or racist comments towards her, and the only ones who allegedly act in a "racist, biased manner" was White and Shah. (Doc. No. 29 at 17). She has not established that the supposedly "nitpicky" micro-management, was based on race or that any racially-base harassment was severe or persuasive within the meaning of Title VII and, by extension, Section 1981.

In determining whether conduct is severe or pervasive, a court is to consider the "totality of the circumstances," utilizing both an objective and subjective test. Clay v. United Parcel Serv., Inc., 501 F.3d 695, 707 (6th Cir. 2007) (citation omitted); Williams v. General Motors, 187 F.3d 553, 562 (6th Cir. 1999). "[I]n other words, the conduct must be so severe or pervasive as to

20

constitute a hostile or abusive working environment both to the reasonable person and the actual victim." Randolph v. Ohio Dept. of Youth Serv's, 453 F.3d 724, 733 (6th Cir. 2006). That simply does not exist on this record. What might have existed were some internecine disputes between Pruitt and White, but the anti-harassment laws do not serve as "a general civility code for the American workplace," Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998), and "petty slights or minor annoyances that often take place at work and that all employees experience" are insufficient to establish a hostile work environment claim, Burlington Northern, 548 U.S. at 58.

## D. Remaining Claims

Pruitt's remaining claims for unequal pay and failure to promote require even less discussion. Notwithstanding that CHSPSC fully addressed both of those claims in its opening brief, Pruitt raises no legal argument in support of either. For this reason alone, the claims fail. See Brown v. VHS of Mich., Inc., 545 Fed. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."); Golden v. Metro. Gov't of Nashville & Davidson Cty., 263 F. Supp. 3d 684, 690 (M.D. Tenn. 2017) (following Brown and finding plaintiff's claim abandoned where no arguments were raised).

Regardless, both claims fail at the *prima facie* stage. To establish a failure to promote claim a plaintiff must show, among other things, that she applied and was qualified for a promotion, and that another employee with similar qualifications who was not a member of the protected class received the promotion. Kraemer v. Luttrell, 189 F. App'x 361, 368 (6th Cir. 2006); Nguyen v. City of Cleveland, 229 F.3d 559, 562-63 (6th Cir. 2000). In her deposition, Pruitt identified the systems analyst positions as the ones she sought and should have received. However, three of the four positions were not filled. As for the fourth, Pruitt entered into in her associate application systems

analyst position with no IS experience, and she has not shown that she developed the requisite qualifications for the analyst position while in that role. Besides, VanEtten, the selected applicant, had substantially more experience in the relevant areas.[5]

As for unequal or disparate pay, Pruitt was required to "present evidence that would allow a jury to find, among other things, that she was paid less than white employees who were 'similarly situated." Richardson v. Wayne State Univ., 587 F. App'x 284, 286 (6th Cir. 2014) (citing Ercegovich v. Goodyear Tire and Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998). To be similarly situated, "the individuals with whom [Pruitt] seeks comparison 'must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Hughes v. Gen. Motors Corp., 212 F. App'x 497, 503 (6th Cir. 2007) (quoting Mitchell, 964 F.2d at 583. "In other words, the people to whom [Pruitt] wishes to draw a comparison must be similar to her in all relevant aspects." Id. (quoting Clayton v. Meijer, Inc., 281 F.3d 605, 611 (6th Cir. 2002)). None of the applicants Pruitt proposes as comparators are substantially similar; all came from the outside, and CHSPSC was trying to be competitive in the marketplace. See Moore v. Shands Jacksonville Med. Ctr., Inc., No. 3:09-CV-298-J-34TEM, 2013 WL 11327135, at *8 (M.D. Fla. Oct. 18, 2013) (dismissing equal pay act claim where plaintiff was paid less than new hires in same position because there was nothing to show that discrepancy was based on race); Sharpe v. Global Sec. Int'l, 766 F. Supp. 2d 1272, 1296 n.29 (S.D. Ala. 2011) (observing in dicta that "if an employer hires a black employee at $10.00 per hour, then raises its

---

[5] Insofar as Pruitt's failure to promote claim relates to the Project Manager position, that, too, fails because Pruitt did not have a bachelor's degree.

pay scale for new hires across the board by $1.00 before hiring a white employee at $11.00 per hour, the two workers would not be similarly situated"). In any event, three of the five associate systems analyst who were paid less than Pruitt were Caucasian, and seven African American associate application systems analyst were paid more than the external new hires. In short, there is not a whit of evidence to suggest that race played a role in setting Pruitt's salary, and for this reason her equal pay claim fails.

### IV. Conclusion

On the basis of the foregoing, the Court will grant summary judgment to CHSPSC on all but Pruitt's claim for retaliation under Section 1981.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

23